689 A.2d 65

JAKANNA WOODWORKS, INC.

v.

MONTGOMERY COUNTY, Maryland.

No. 18 Sept. Term, 1996.

Court of Appeals of Maryland.

Feb. 13, 1997.

586

James C. McKay (Thomasenia P. Duncan, Gail H. Javitt, Frank Partnoy, Covington & Burling, Washington, DC; Elizabeth M. Boyle, Alexandria, VA; Arthur B. Spitzer, ACLU, Washington, DC; Susan Goering, ACLU, Baltimore), on brief, for Petitioner.

Charles W. Thompson, Jr., County Attorney (Linda B. Thall, Senior Assistant County Attorney; Clifford L. Royalty, Assistant County Attorney, on brief), Rockville, for Respondent.

Daniel J. Popeo, Paul D. Kamenar, Washington Legal Foundation, Edward J. Grass, Wiley, Rein & Fielding, Daniel E. Troy, Lon A. Berk, Wiley, Rein & Fielding, Washington, D.C., amicus curiae, The Washington Legal Foundation in support of Petitioner.

Before BELL, C.J. and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, RAKER and WILNER, JJ.

CHASANOW, Judge.

The issue in this case is whether Chapter 30–10 of the Montgomery County Code, which requires merchants to obtain a license before advertising a "closing-out sale," impermissibly infringes upon the constitutional rights of merchants to engage in truthful and non-misleading commercial speech, both because Chapter 30–10 is not narrowly tailored to advance directly a substantial government interest and because it constitutes a prior restraint on speech. For the reasons set forth below, we hold that Chapter 30–10 does impermissibly impinge upon truthful and non-misleading commercial speech and that it is unconstitutional.

I.

Petitioner is a small, family-owned furniture store. The store has been in operation for fifteen years in Rockville,

Maryland. In April 1995, Petitioner's proprietors, Morton Jacobs and his wife, Anna Wheeler, decided to look for a larger store with additional space in which to display furniture and to store inventory. The proprietors found a suitable space across the street from the Rockville store and entered into a lease in May of 1995.

In order to minimize inventory damage and moving costs, Jacobs decided to attempt to sell all of his old inventory before the move and to order all new inventory for the new store. A successful sale of the old inventory would require advertisement, and Jacobs decided to place an advertisement in the Montgomery Gazette. The advertisement, which appeared on May 17, 1995, read:

"PUBLIC NOTICE

FURNITURE LIQUIDATION

One of the metro area's largest wood furniture specialty stores is selling off their entire store and warehouse inventory[.] Every Floor Sample and Every Item In Stock Must Be Sold!

SELLING OUT TO THE BARE WALLS

NOTHING HELD BACK!"

The advertisement went on to list the store's address, its hours of operation, and the prices of some of the furnishings that would be available for purchase. It is undisputed that the address, hours, and prices listed in the advertisement were truthful.

Unbeknownst to Jacobs, by using the word "liquidation" in the advertisement, and perhaps based on the advertisement's content, he had advertised a "closing-out sale" in violation of Chapter 30–10 of the Montgomery County Code.

" 'Closing-out sale' includes any sale advertised, represented or held under the designation of 'going out of business,' 'discontinuance of business,' 'selling out,' 'liquidation,' 'lost our lease,' 'must vacate,' 'forced out,' 'removal' or any similar designation but does not include the closing out of an item of merchandise." [1]

---

1. A "closing-out sale" is also defined as:

Montgomery County Code, § 30–10(a)(2)(1994). Chapter 30–10 prohibits any person from advertising a "closing-out sale" without first obtaining a license from the Director of the Office of Consumer Affairs ("Director"). Montgomery County Code, § 30–10(b)(1).[2] To receive such a license, one must file an application under oath and pay an application fee. Montgomery County Code, § 30–10(b)(2),(3). The application, which must be filed no later than 14 days before the opening date of the sale, must contain

"all relevant facts relating to the sale, including:

(A) the first and last dates of the proposed sale;

(B) the date when the owner of the business intends to stop the operations of the business at the location or locations listed in the application;

(C) a complete inventory of the merchandise to be sold;

(D) a list of all persons with an ownership interest in the business if the business does not have publicly-traded shares;

(E) the text of all advertising that will be placed in print or electronic media in connection with the proposed sale; and

(F) all details necessary to locate exactly and identify the merchandise to be sold."

---

"any sale in connection with which the person conducting the sale represents that the sale is being conducted, or must be conducted, for reasons of
 (A) economic or business distress,
 (B) inability to continue business at the same location, or
 (C) the age or health of an owner of the business."
Montgomery County Code, § 30–10(a)(1)(1994).

**2.** Section 30–10(b)(1) provides:
"A person must not advertise or offer for sale in the County merchandise under the description of 'closing-out sale' ... unless the owner of the business obtains a license to conduct the sale from the [Director of the Office of Consumer Affairs]."
Montgomery County Code, § 30–10(b)(1). Effective July 1, 1996, the ordinance was amended, and the Department of Housing and Community Affairs was substituted for the Office of Consumer Affairs.

MONTGOMERY COUNTY CODE, § 30–10(b)(2)(A)–(F). The penalty for violating Chapter 30–10 is a $500 fine for every day that the advertisement appears. MONTGOMERY COUNTY CODE, §§ 1–19, 30–10(d).

The statute states that, after receiving all of the information required by Chapter 30–10 and the application fee, the Director "may" grant a license if she is "satisfied ... that the proposed sale is consistent with the proposed advertising." MONTGOMERY COUNTY CODE, § 30–10(b)(3). The Director testified at trial that, although not required to do so by the statute, she would make an on-site investigation of an applicant's premises before deciding whether to grant a license. The inspections "could take a couple of days." Chapter 30–10 does not explicitly establish any time within which the Director must announce his or her decision whether to grant or deny a license.

Jacobs was not aware of the requirements of Chapter 30–10, and he did not apply for a license before he placed his advertisement in the MONTGOMERY GAZETTE. As a result of his advertisement, Jacobs was issued a citation, which provided that he could either stand trial or pay a $500 fine. The citation read: "the word [liquidation] can only be used in connection with a closing out sale, which requires a License. [Jakanna Woodworks] did not have a License." Petitioner chose to stand trial in the District Court of Maryland rather than to pay the fine assessed, and the proceedings took place in October of 1995. The judge found that Petitioner had violated Chapter 30–10 and imposed a $100 fine.

Petitioner appealed the judgment to the Circuit Court for Montgomery County, and a trial *de novo* was held in January of 1996 before Judge Pincus. Petitioner argued that Chapter 30–10 was an overly broad regulation of commercial speech and an invalid prior restraint that violated the First and Fourteenth Amendments to the United States Constitution and Article 40 of the Maryland Declaration of Rights. Petitioner argued that the circuit court should apply a four-part, intermediate scrutiny test to resolve the issue of overbreadth

and that the court should examine whether the statute provided sufficient procedural safeguards to determine whether it was a valid prior restraint.

Montgomery County ("the County"), the defendant below, did not address the overbreadth argument, and it only briefly addressed one of Petitioner's prior restraint arguments. Instead, it argued that the ordinance should be presumed valid and that it had a "clear, rational purpose to protect consumers." Based on its belief that advertisements containing the words listed in the ordinance often are untruthful or misleading, the County enacted the ordinance to protect consumers. The Director confirmed, however, that a citation was issued to Petitioner solely because the word "liquidation" appeared in its advertisement and not because she knew or suspected that the advertisement was false or misleading. Petitioner was issued a citation because its advertisement, which used one of the trigger words listed in the ordinance, fell within the scope of Chapter 30–10 and, therefore, required a license.

At the close of all evidence, Judge Pincus, apparently accepting the County's argument that no serious First Amendment violation was at hand and that no overbreadth or prior restraint analysis was required, concluded that Chapter 30–10 was a "legitimate exercise of governmental power" and that the ordinance served "a legitimate governmental interest." The judge stated that he could find nothing unreasonable about the law and found that it did not violate either the U.S. Constitution or the Maryland Declaration of Rights. Judge Pincus imposed a $100 fine.

■ Because the Circuit Court for Montgomery County had already provided appellate review of the District Court judgment, Petitioner was not able to have the judgment of the circuit court reviewed by the Court of Special Appeals. Maryland Code (1974, 1995 Repl.Vol.), Courts & Judicial Proceedings, §§ 12–302, 12–305. This Court granted Petitioner's petition for a writ of certiorari in April of 1996.

## II.

We begin by recalling that the First Amendment to the United States Constitution applies to the states via the Fourteenth Amendment, *see Central Hudson Gas v. Public Service Comm'n,* 447 U.S. 557, 561, 100 S.Ct. 2343, 2349, 65 L.Ed.2d 341, 348 (1980); *Freedman v. State,* 233 Md. 498, 501, 197 A.2d 232, 234 (1964), *rev'd on other grounds,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), and that the freedoms protected by Article 40 of the Maryland Declaration of Rights have been interpreted by this Court to be co-extensive with the freedoms protected by the First Amendment. *Freedman,* 233 Md. at 505, 197 A.2d at 235–36 ("The guaranty of freedom of speech and press ordained in Art. 40 would appear to be, in legal effect, substantially similar to that enunciated in the First Amendment, and it is significant that Art. 40 has been treated by this Court as in *pari materia* with the First Amendment."). Thus, the issues in this case may be resolved by applying United States Supreme Court case law interpreting the First Amendment. Several well-settled principles have emerged from the Supreme Court's interpretation of the First Amendment, both as to commercial speech and as to prior restraints on speech.

### A.

Commercial speech is "expression related solely to the economic interests of the speaker and its audience." *Central Hudson,* 447 U.S. at 561, 100 S.Ct. at 2349, 65 L.Ed.2d at 348 (citing *Virginia Pharmacy Board v. Virginia Citizens Consumer Council,* 425 U.S. 748, 762, 96 S.Ct. 1817, 1825–26, 48 L.Ed.2d 346, 359 (1976)). Commercial speech is protected from unwarranted governmental regulation, however, because commercial speech "not only serves the economic interest of the speaker, but also furthers the societal interest in the fullest possible dissemination of information." *Central Hudson,* 447 U.S. at 561–62, 100 S.Ct. at 2349, 65 L.Ed.2d at 348. Because society benefits only from the full dissemination of certain kinds of commercial speech, however, "[t]he Constitu-

tion . . . accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Central Hudson,* 447 U.S. at 562–63, 100 S.Ct. at 2350, 65 L.Ed.2d at 348–49 (citing *Ohralik v. Ohio State Bar Assn.,* 436 U.S. 447, 456–57, 98 S.Ct. 1912, 1918–19, 56 L.Ed.2d 444, 453–54 (1978)).

A governmental restriction on commercial speech will be tolerated if the restriction satisfies the four-part, intermediate scrutiny test enunciated by the Supreme Court in *Central Hudson:*

> "At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest."

*Central Hudson,* 447 U.S. at 566, 100 S.Ct. at 2351, 65 L.Ed.2d at 351. In *Central Hudson,* the Supreme Court struck down a regulation of the Public Service Commission of the State of New York that banned all forms of promotional advertising by an electrical utility. The Commission argued that the regulation served the substantial state interests of promoting energy conservation and ensuring fair rates. *Central Hudson,* 447 U.S. at 559–60, 100 S.Ct. at 2347–48, 65 L.Ed.2d at 346–47. Promotional advertising, the Commission argued, could send "misleading signals" to consumers by appearing to promote energy consumption, which necessarily would be detrimental to the state's goal of energy conservation. *Central Hudson,* 447 U.S. at 560, 100 S.Ct. at 2348, 65 L.Ed.2d at 347. Also, the Commission stated that any additional electricity would be more expensive to produce, yet the Commission argued that the additional power would likely be sold at a cost lower than the cost of generation. *Id.* All consumers would be forced to pay higher rates to subsidize the lower pricing, and this would not serve the state's goal of ensuring fair and efficient rates. *Id.*

The Supreme Court analyzed the New York regulation pursuant to the four-part test outlined above. The Court explained that the speech being banned, which was not inaccurate and did not concern illegal activity, was entitled to First Amendment protection. *Central Hudson,* 447 U.S. at 566–68, 100 S.Ct. at 2351–52, 65 L.Ed.2d at 351–52. The Court agreed that the two governmental interests served by the regulation, ensuring fair and efficient rates and conserving energy, were substantial. *Central Hudson,* 447 U.S. at 568–69, 100 S.Ct. at 2352–53, 65 L.Ed.2d at 352–53. The Court then stated that the regulation did not directly promote the interest of ensuring fair and efficient rates but that the regulation did directly advance the interest of energy conservation. *Central Hudson,* 447 U.S. at 569, 100 S.Ct. at 2353, 65 L.Ed.2d at 353. The Court noted, however, that the complete ban prohibited promotional advertising "that would cause no net increase in total energy use" or that could have a beneficial impact. *Central Hudson,* 447 U.S. at 570, 100 S.Ct. at 2353, 65 L.Ed.2d at 353. Thus, the Court declared the regulation to be invalid because it was "more extensive than necessary to further the State's interest in energy conservation." *See Central Hudson,* 447 U.S. at 569–71, 100 S.Ct. at 2353–54, 65 L.Ed.2d at 353–54.

The *Central Hudson* intermediate scrutiny test was recently applied in *Florida Bar v. Went For It, Inc.,* 515 U.S. ——, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995). In *Florida Bar,* the Supreme Court upheld two rules of the Florida Bar that, together, prohibited lawyers from soliciting, directly or indirectly, victims of an accident or disaster, or the relatives of such victims, by direct mail within 30 days of the accident or disaster. *Florida Bar,* 515 U.S. at ——, 115 S.Ct. at 2374, 132 L.Ed.2d at 547. The rules were adopted in response to the results of a two-year study, conducted by the Florida Bar, of the effects of lawyer advertising on public opinion. *Id.* The study revealed that "direct mail solicitations in the wake of accidents are perceived by [Floridians] as intrusive. . . ." *See Florida Bar,* 515 U.S. at ——, 115 S.Ct. at 2376, 132 L.Ed.2d at 550. The Bar adopted the rules to prevent Florida attorneys from engaging in "deplorable" conduct that would further

injure victims and their relatives and that would degrade the already "flagging" reputations of the attorneys themselves. *Florida Bar*, 515 U.S. at ——, 115 S.Ct. at 2376, 132 L.Ed.2d at 549–50. A Florida attorney and his wholly-owned lawyer referral service challenged the constitutionality of the two rules on First and Fourteenth Amendment grounds. *Florida Bar*, 515 U.S. at ——, 115 S.Ct. at 2374, 132 L.Ed.2d at 547.

The Court explained that the speech the Bar sought to regulate was not misleading and, therefore, that the rules could be tolerated only if they survived intermediate scrutiny under the *Central Hudson* test. *Florida Bar*, 515 U.S. at ——, 115 S.Ct. at 2375–76, 132 L.Ed.2d at 549. The Court easily concluded that the rules served the substantial interest of "protecting the privacy and tranquility of personal injury victims and their loved ones against intrusive, unsolicited contact by lawyers," *Florida Bar*, 515 U.S. at ——, 115 S.Ct. at 2376–77, 132 L.Ed.2d at 549–50, as well as the interest of preserving the integrity of the legal profession. *Florida Bar*, 515 U.S. at ——, 115 S.Ct. at 2381, 132 L.Ed.2d at 556. A summary of the Bar's two-year study of the effects of lawyer advertising on public opinion, which contained anecdotal and statistical data supporting the Bar's position, was submitted to the Court, and the summary convinced the Court that the rules directly and materially advanced the Bar's interest. *See Florida Bar*, 515 U.S. at ——, 115 S.Ct. at 2377–79, 132 L.Ed.2d at 550–52. Finally, the Court held that because solicitations were banned for such a brief time, and because ample opportunities to obtain similar information elsewhere during the temporary ban existed, the rules were "reasonably well-tailored to [the Bar's] stated objective. . . ." *Florida Bar*, 515 U.S. at ——, 115 S.Ct. at 2380, 132 L.Ed.2d at 555. The Court concluded with a summary of its holdings:

> "The Bar has [a] substantial interest both in protecting injured Floridians from invasive conduct by lawyers and in preventing the erosion of confidence in the profession that such repeated invasions have engendered. The Bar's proffered study, unrebutted by respondents below, provides evidence indicating that the harms it targets are far from

illusory. The palliative devised by the Bar to address these harms is narrow both in scope and duration. The Constitution, in our view, requires nothing more."

*Florida Bar,* 515 U.S. at ——, 115 S.Ct. at 2381, 132 L.Ed.2d at 556.

### B.

A statute, ordinance, or regulation that prevents expression unless and until a license or permit is obtained from a governmental official or group is a prior restraint on speech. *See, e.g., Saia v. New York,* 334 U.S. 558, 559–60, 68 S.Ct. 1148, 1149, 92 L.Ed. 1574, 1577 (1948); *Shuttlesworth v. Birmingham,* 394 U.S. 147, 150–51, 89 S.Ct. 935, 938–39, 22 L.Ed.2d 162, 167 (1969). Prior restraints "present[ the] danger of unduly suppressing protected expression," *see Freedman v. Maryland,* 380 U.S. at 54, 85 S.Ct. at 737, 13 L.Ed.2d at 652, and therefore, "bear[ ] a heavy presumption against [their] constitutional validity." *Bantam Books v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584, 593 (1963). That heavy burden may be rebutted, however, and a prior restraint on speech may be tolerated, if adequate procedural safeguards exist to protect against unduly suppressing protected speech. *Freedman,* 380 U.S. at 58–60, 85 S.Ct. at 738–39, 13 L.Ed.2d at 654–55.

In *Freedman,* the Court struck down a Maryland statute that prohibited, among other things, the sale or exhibition of any film without a license from the State Board of Censors. 380 U.S. at 52, 85 S.Ct. at 735, 13 L.Ed.2d at 651. Freedman, a filmmaker, challenged the statute on the ground that it risked unduly suppressing protected expression because any exhibition of a film was prohibited until the Board reached a decision or, if the Board denied a license, until the exhibitor could pursue a time-consuming appeal in the Maryland courts. *Freedman,* 380 U.S. at 54–55, 85 S.Ct. at 737, 13 L.Ed.2d at 652. Thus, speech that might later be held, after judicial review, to be protected by the First Amendment potentially could be suppressed for a lengthy period of time.

To avoid such an occurrence, the Supreme Court outlined three procedural safeguards that a prior restraint on speech must contain if it is to be upheld against a First Amendment challenge:

> "(1) any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court."

*FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 227, 110 S.Ct. 596, 606, 107 L.Ed.2d 603, 619 (1990)(citing *Freedman,* 380 U.S. at 58–60, 85 S.Ct. at 739, 13 L.Ed.2d at 654–55). The Court struck down the Maryland film statute as an unconstitutional prior restraint on speech because the statute failed to provide any of these safeguards.

■ Since *Freedman,* Supreme Court cases concerning prior restraints have tended to focus on two evils: (1) a scheme that places unfettered discretion in the hands of a government official or group to grant or deny a permit or license, and (2) a scheme that does not place limits on the time within which the decision maker must issue the permit or license. *FW/PBS,* 493 U.S. at 225–26, 110 S.Ct. at 604–05, 107 L.Ed.2d at 618. A scheme that places unfettered discretion in the hands of a government official or group to grant or deny a permit or license to engage in a right that is guaranteed by the First Amendment is an impermissible prior restraint on speech. *Staub v. Baxley,* 355 U.S. 313, 325, 78 S.Ct. 277, 284, 2 L.Ed.2d 302, 313 (1958).

> "It is settled by a long line of recent decisions of this Court that an ordinance which ... makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitu-

tional censorship or prior restraint upon the enjoyment of those freedoms."

*Staub,* 355 U.S. at 322, 78 S.Ct. at 282, 2 L.Ed.2d at 311.

For example, in *Lakewood v. Plain Dealer,* 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988), the Supreme Court invalidated portions of an ordinance regulating the placement of news racks in the City of Lakewood, Ohio. The ordinance allowed newspaper dispensing machines to be placed on city sidewalks only with a permit, and the ordinance gave authority to Lakewood's mayor to grant or deny permit applications. *Lakewood,* 486 U.S. at 753, 108 S.Ct. at 2142, 100 L.Ed.2d at 780. The ordinance stated: " 'The Mayor shall either deny the application, stating the reasons for such denial or grant said permit subject to following terms. . . .' " *Id.* at n. 2 (quoting LAKEWOOD, OHIO, CODIFIED ORDINANCES § 901.181 (1984)). A list of terms followed, one of which stated: " 'such other terms and conditions deemed necessary and reasonable by the Mayor.' " *Id.* This broad language negated whatever limits on mayoral discretion might have been imposed by the specific terms and conditions listed. Thus, the Court stated: "It is apparent that the face of the ordinance itself contains no explicit limits on the Mayor's discretion." *Lakewood,* 486 U.S. at 769, 108 S.Ct. at 2150, 100 L.Ed.2d at 791.

The Court, furthermore, expressly disapproved of the City's argument that the Court should presume that the mayor would only deny a permit application for reasons relating to the health, safety, or welfare of the citizens of Lakewood. *Lakewood,* 486 U.S. at 770, 108 S.Ct. at 2151, 100 L.Ed.2d at 791. The City argued that additional terms and conditions, similarly, would only be imposed for reasons relating to the health, safety, or welfare of Lakewood citizens. *Id.* In response to these arguments the Court explained:

"This presumes the Mayor will act in good faith and adhere to standards absent from the statute's face. But this is the very presumption that the doctrine forbidding unbridled discretion disallows." (Citation omitted).

*Id.* The Court declared the portions of the ordinance that granted unfettered discretion to the mayor to deny a permit application or to condition the grant of a permit on any additional terms he deemed necessary and reasonable to be facially invalid. *Lakewood,* 486 U.S. at 772, 108 S.Ct. at 2152, 100 L.Ed.2d at 792.

The Supreme Court has stated that the failure to limit the time within which a governmental official must decide whether to grant or deny a permit or license creates the same danger as allowing a governmental official to exercise unfettered discretion. *FW/PBS,* 493 U.S. at 226–27, 110 S.Ct. at 605, 107 L.Ed.2d at 619 (citing *Freedman,* 380 U.S. at 56–57, 85 S.Ct. at 737, 13 L.Ed.2d at 649). In *FW/PBS,* a Texas ordinance that regulated sexually-oriented businesses was invalidated because it lacked adequate procedural safeguards. 493 U.S. at 225–29, 110 S.Ct. at 604–06, 107 L.Ed.2d at 618–20. Although there was no majority opinion as to exactly what procedural safeguards should have been required, six Justices were able to agree that two of the *Freedman* safeguards were essential and that the Texas ordinance should be invalidated because it lacked one of those safeguards. *FW/PBS,* 493 U.S. at 225–30, 238–39, 110 S.Ct. at 604–07, 611, 107 L.Ed.2d at 618–21, 626–27.

The Texas ordinance subjected sexually-oriented businesses to a combination of zoning, licensing, and inspection requirements. *FW/PBS,* 493 U.S. at 220–21, 110 S.Ct. at 602, 107 L.Ed.2d at 615. In *FW/PBS,* the Court considered whether "the licensing scheme fail[ed] to set a time limit within which the licensing authority must issue a license and, therefore, creates the likelihood of arbitrary denials and the concomitant suppression of speech." *FW/PBS,* 493 U.S. at 223, 110 S.Ct. at 603, 107 L.Ed.2d at 616. At first glance, the ordinance appeared to ensure a prompt decision; the ordinance granted power to the chief of police to grant or deny a license and required that the decision be made within 30 days after an application was submitted. *FW/PBS,* 493 U.S. at 227, 110 S.Ct. at 605, 107 L.Ed.2d at 619.

Another provision in the ordinance, however, stated that the chief of police could not issue a license until all of the required inspections were completed. *Id.* Under the ordinance, sexually-oriented businesses were required to be inspected by the health department, fire department, and the building official before a license could be granted. *Id.* The ordinance, however, did not specify a time within which the authorities were required to complete their inspections. *Id.* Thus, a prospective licensee actually had no assurance that the decision to deny or grant a license would be made in a brief and reasonable period of time.

A majority of the Justices agreed that the ordinance violated *Freedman*'s requirement that the decision to grant a license be made within a brief and reasonable period of time. *FW/PBS*, 493 U.S. at 225–30, 238–39, 110 S.Ct. at 604–07, 611, 107 L.Ed.2d at 618–21, 626–27. The Court invalidated the Texas ordinance stating that "the city's regulatory scheme allows indefinite postponement of the issuance of a license" in violation of *Freedman.* *FW/PBS*, 493 U.S. at 227, 110 S.Ct. at 606, 107 L.Ed.2d at 619.

### III.

Montgomery County characterizes Chapter 30–10 as a consumer protection statute that regulates misleading commercial speech. Contrary to its position below, the County apparently accepts that this case must be analyzed under the *Central Hudson* test and argues that Petitioner's advertisement fails the first element of that test, which requires that the speech to be regulated not be misleading. The County, however, seems to view every advertisement concerning "closing-out" sales as inherently misleading.

Petitioner concedes that consumers often equate liquidation or distress sales with deep discounts and good bargains. The words singled out in the statute all signify that a merchant is ceasing all operations, either of his or her own volition, or at someone else's demand, or is in economic distress. But sometimes, a merchant who advertises a "closing-out" sale is

not in economic distress or is not being forced to cease all operations. For example, Petitioner's advertisement was part of a plan to expand its business. The County apparently concludes, however, that upon reading the advertisement, consumers could have assumed that Petitioner was in distress or was closing permanently and that it would offer exceptionally low prices on its merchandise. If Petitioner had submitted a copy of its advertisement for review by the Director, she could have determined whether the advertisement was unacceptably misleading.

In its brief, the County contends that Petitioner's advertisement is misleading and states: "The deceptiveness of [Petitioner's] advertisement is apparent on its face" because it uses the words "Public Notice," which "give the impression that the sale is being conducted by some official entity or that the sale is in the nature of a foreclosure or bankruptcy sale." Petitioner was not conducting such a sale, however, and the County argues that persons who saw the advertisement could have been unfairly misled.

At oral argument, the County argued that the advertisement was actually untruthful because it said in several different ways that *all* of Petitioner's inventory had to be sold. At trial, however, the proprietor testified that all of Petitioner's inventory was not sold and that the unsold inventory was taken to the new store. Without regard to its earlier assertion that "closing-out" sales are inherently misleading, the County seems to suggest that if Petitioner had sold all of its inventory the advertisement would not have been misleading. The County claims that the advertisement was a misrepresentation calculated to deceive the public, and it apparently does so because Petitioner did not use every means possible to rid itself of all inventory.

Assuming *arguendo* that the remaining elements of the *Central Hudson* test must be examined, the County argues that Chapter 30–10 is constitutional because it satisfies those elements. "[T]he unequivocal intent of the County's statute is to protect consumers from fraudulent and misleading business

practices." The County contends that the substantiality of this interest has been established as a matter of law through several case holdings, such as *Florida Bar v. Went For It, Inc.*, 515 U.S. ——, ——, 115 S.Ct. 2371, 2376, 132 L.Ed.2d 541, 549 (1995)("Under *Central Hudson,* the government may freely regulate commercial speech that ... is misleading.") and *Friedman v. Rogers*, 440 U.S. 1, 15, 99 S.Ct. 887, 897, 59 L.Ed.2d 100, 113 (1979)("It is clear that the State's interest in protecting the public from the deceptive and misleading use of optometrical trade names is substantial and well demonstrated.").

In support of its claim that Chapter 30–10 directly advances its interest, the County states: "the statute requires that the merchant provide specific information to the Office of Consumer Affairs so that [it] may determine whether that merchant is conducting a legitimate distress sale." If the Director finds that the merchant is not conducting a legitimate distress sale, she can protect the public by denying a license to place the advertisement.

Finally, the County contends that Chapter 30–10 is narrowly tailored because of its use of "triggering words." Only certain words trigger the applicability of Chapter 30–10, those that are inherently misleading to consumers. These triggering words, *e.g.,* "liquidation," "going out of business," "lost our lease," all imply distress, non-voluntariness and perhaps the need to sell at any price. Thus, the County argues that Chapter 30–10 is narrowly tailored and will burden only advertisements that are actually fraudulent or that use inherently misleading words.

Two arguments have been advanced by the County as to why Chapter 30–10 is a valid prior restraint on speech. The first is that Chapter 30–10 provides "narrow, objective and definite" standards to guide the Director in her decision to grant or withhold a license. *See Shuttlesworth,* 394 U.S. at 150–51, 89 S.Ct. at 938–39, 22 L.Ed.2d at 167 (stating that "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and

definite standards to guide the licensing authority, is unconstitutional"). Chapter 30–10 requires that certain information be submitted with each application. The Director is supposed to examine this information, and she may grant a license if she is "satisfied ... that the proposed sale is consistent with the proposed advertising." MONTGOMERY COUNTY CODE, § 30–10(b)(3). The County characterizes these requests for information as guidelines that satisfy the requirement that the Director's discretion be limited and states that, with a few limited exceptions clearly outlined in the statute, "[i]f the application contains the required information, is accompanied by the application fee, and is filed within the time period provided, the license is granted if the proposed advertisement is found to be consistent with the proposed sale."

The County also argues that the ordinance is not an invalid prior restraint because it ensures that a license will be issued within a brief and reasonable period of time. Chapter 30–10 requires anyone who wishes to advertise a "closing-out" sale to apply for a license to do so 14 days before the sale is scheduled to begin. Thus, the County concludes: "Although not expressly stated as such, [the ordinance] *contemplates* that a decision on the application for a license will be made in fourteen days or less in order to permit the sale to begin as scheduled." (Emphasis added). It also explained that every attempt is made to issue a decision within the 14 day window and that, in practice, the decision is typically made in " 'a couple of days' " after an on-site inspection of the premises of the sale is held.

### IV.

Petitioner first argues that the Circuit Court for Montgomery County applied the incorrect standard of judicial review to Montgomery County's ordinance. Although the applicability of the *Central Hudson* test was argued before the circuit court, Judge Pincus failed to apply that test. The court found Chapter 30–10 to be a "legitimate exercise of governmental power" that served "a legitimate governmental interest" and stated that there was "nothing unreasonable" about

the law. Thus, it seems that the circuit court applied a standard of review analogous to the rational basis test. As discussed previously, the correct test to apply to statutes that require licensure before engaging in commercial speech is the four-part *Central Hudson* test.

■ The circuit court did not make any findings of fact upon which we might rely as to the elements of the *Central Hudson* test. Even if the trial court had made factual findings, however, it would be our obligation to make an independent review of the record. *Bachellar v. Maryland*, 397 U.S. 564, 566, 90 S.Ct. 1312, 1313, 25 L.Ed.2d 570, 573 (1970).

> "Since petitioners argue that their conduct was constitutionally protected, we have examined the record for ourselves. When 'a claim of constitutionally protected right is involved, it "remains our duty . . . to make an independent examination of the whole record." ' "

*Id.* (citing *Cox v. Louisiana*, 379 U.S. 536, 545 n. 8, 85 S.Ct. 453, 459 n. 8, 13 L.Ed.2d 471, 478 n. 8 (1965)); *see also Edwards v. South Carolina*, 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697, 701–02 (1963); *New York Times v. Sullivan*, 376 U.S. 254, 284–85, 84 S.Ct. 710, 728–29, 11 L.Ed.2d 686, 709 (1964).

## A.

■ The burden of proof as to the first element of the *Central Hudson* test, whether the speech regulated by Chapter 30–10 is misleading, is on Petitioner. Petitioner argued at trial and on appeal that the advertisement was not misleading. The County seemed to stipulate at trial that Petitioner's advertisement was truthful and non-misleading, but even if, as the County now contends, no such stipulation was made, it has not produced any evidence upon which this Court would conclude that the advertisement was untruthful or misleading.

■ We disagree with several of the arguments advanced by the County suggesting that Petitioner's advertisement was untrue or misleading. The first is that advertisements of "closing-out" sales are inherently misleading.

Clearly, some merchants who use the trigger words in Chapter 30–10 are legitimately in distress or are truly closing their businesses permanently. Such people need the benefits of advertising their sales, and consumers will not be deceived by advertisements of this sort. We also disagree that Petitioner's advertisement was inherently misleading because it used the words "Public Notice." The advertisement merely gives notice to the public of an impending sale and implies no more than that. Finally, we cannot say that the advertisement should be considered untruthful simply because Petitioner's entire inventory was not sold. Petitioner wanted to sell out "to the bare walls," and it would have benefitted from doing so. The County has not suggested that Petitioner did anything to prevent the sale of its entire inventory. Petitioner stated that the entire inventory did not sell because there were not enough interested buyers. It may be unreasonable to expect that a merchant would ever know whether there will be enough interested buyers to purchase a merchant's entire inventory 14 days before a sale begins, which is the time that advertisements must be submitted to the Director under Chapter 30–10.

As to the other three elements of the *Central Hudson* test, the burden of proof rests on the County to prove that Chapter 30–10 directly advances a substantial government interest and is not any more extensive than necessary to achieve that interest. The County has argued at trial and on appeal that its interest is in protecting consumers from false or misleading advertisements. The Supreme Court has recognized that protecting consumers from such advertisements is a substantial governmental interest. *See, e.g., Friedman,* 440 U.S. at 15, 99 S.Ct. at 897, 59 L.Ed.2d at 113.

Chapter 30–10 does not, however, directly advance the County's interest in protecting consumers from deceptive advertising. The restriction of common words such as "liquidation" will do little to prevent false advertising. In fact, the Director conceded at trial that Petitioner was issued a citation for using the word liquidation in its unlicensed advertisement

and *not* because the advertisement was false or misleading. Words such as "liquidation" and "going out of business" also seem to this Court to be no more misleading than words such as "50% off," which do not require a license.

 Finally, the ordinance is not narrowly drafted to achieve its ends. In addition to regulating deceptive advertisements, the ordinance also regulates speech similar to Petitioner's advertisement, which contains only truthful and non-misleading information. Consumers would not need to be protected from commercial speech of this nature. Rather, consumers benefit from the fullest possible dissemination of information of this kind. *Central Hudson,* 447 U.S. at 561–62, 100 S.Ct. at 2349, 65 L.Ed.2d at 348.

It is entirely possible to draft narrowly a statute that will protect consumers from deceptive advertisements, and the Maryland legislature has done so. For example, Maryland Code (1975, 1990 Repl.Vol.), Commercial Law Art., § 11–703 prohibits any person from "advertis[ing] falsely in the conduct of any business, trade, or commerce, or in the provision of any service." Maryland Code (1975, 1990 Repl.Vol.), Commercial Law Art., § 13–303 prohibits any person from engaging in unfair or deceptive trade practices in the conduct of several consumer transactions. By regulating conduct, these statutes protect consumers from deceptive and misleading advertisements without also unconstitutionally restricting protected speech.

### B.

 Chapter 30–10 is an invalid prior restraint on speech that vests the Director with unfettered discretion to grant or deny a license. The County has argued that the Director does not have unfettered discretion because her decision must be made in accordance with the specific criteria listed in § 30–10(b)(2)(A)(F) of the Montgomery County Code and that, if an applicant meets all of the criteria in that section, the Director must grant the license. But Chapter 30–10 states that the application for a license must include such information; it does

not explicitly require that the Director do anything with the information provided. Furthermore, even after the applicant has provided all of the required information, Chapter 30–10 states the Director "may" grant a license if she is "satisfied . . . that the proposed sale is consistent with the proposed advertising." Thus, the factor that determines whether an applicant will be granted a license is the Director's "satisfaction," a term that is not "narrow, objective, or definite." *See Shuttlesworth,* 394 U.S. at 150–51, 89 S.Ct. at 938–39, 22 L.Ed.2d at 167. The listed criteria may be helpful to the Director, but they do not limit her discretion.

The ordinance also lacks adequate constraints on the time within which the Director may make a decision. The ordinance states that one who wishes to advertise a "closing-out" sale must apply for a license to do so at least 14 days before the sale is to begin. We disagree with the County's conclusion that this provision is, in effect, a limitation on the Director's decision-making time that is brief and reasonable. The ordinance does not explicitly establish a 14–day limit, and the Director faces no penalty for failing to render a decision within 14 days. Even if a court were to find that the Director regularly renders her decisions within 14 days, that court could not assume that she would always adhere to self-imposed time limits. *See Lakewood,* 486 U.S. at 770, 108 S.Ct. at 2151, 100 L.Ed.2d at 791. *Freedman* requires that the time limitation be either explicitly stated in the ordinance itself or established by authoritative judicial construction. *Freedman,* 380 U.S. at 58–59, 85 S.Ct. at 739, 13 L.Ed.2d at 654–55. Neither has been done with regard to Montgomery County's ordinance.

## V.

The judgment of the Circuit Court for Montgomery County must be reversed. We hold that Chapter 30–10 is invalid as an overly broad regulation of commercial speech to the extent that the ordinance does not directly advance the County's stated interest and is more extensive than necessary to

achieve the stated interest. Chapter 30–10 is also invalid as a prior restraint that (1) grants a governmental official unfettered discretion to suppress protected speech, and (2) fails to place an adequate limitation on the amount of time the official may take to determine whether to grant or deny a permit.

*JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED. COSTS TO BE PAID BY MONTGOMERY COUNTY.*